## D. S. PHILLIPS, Appellant, v. J. A. LEUTH, Appellee.

**EVIDENCE:** Relevancy, Materiality, and Competency—Value—Pur-
1   chase Price. The purchase price of a certain number of hogs is
manifestly not evidence of the value of a smaller number which is
involved in the litigation.

**TRIAL:** Reception of Evidence—Reliance on Representations. In an
2   action for damages resulting from the alleged improper vaccination
of hogs, evidence tending to show that plaintiff *relied* on the "state-
ments" of the defendant is properly excluded, said statements con-
sisting of a diagnosis of the ailments of the hogs and of the advis-
ability of vaccination.

**EVIDENCE:** Opinion Evidence—Competency of Expert. An expert
3   witness will not be permitted to give an opinion that animals died
from blood poisoning and that such blood poisoning was caused by
using an unclean hypodermic needle in effecting vaccination, (1)
when his preliminary testimony shows that the animals might have
died from any one of *several* different diseases, all caused by poison-
ous germs' getting into the blood in *innumerable* ways, and that the
witness had never determined the disease of which the animals died,
though such fact was scientifically determinable; and (2) when the
witness had no personal knowledge of the conditions under which
the vaccination was made, and such conditions were not submitted
to him in the hypothetical question.

Headnote 1: 22 C. J. p. 184. Headnote 2: 40 Cyc. p. 2433. Headnote 3:
22 C. J. pp. 644, 710.

*Appeal from Pottawattamie District Court.*—TOM C. WHITMORE,
Judge.

JUNE 25, 1925.

ACTION for damages against the defendant, as a veterinary
surgeon, for negligent vaccination of plaintiff's hogs. The an-
swer was a general denial. At the close of the plaintiff's evi-
dence, the trial court directed a verdict for the defendant. The
plaintiff appeals.—*Affirmed.*

*Robertson & Robertson,* for appellant.

*Tinley, Mitchell, Ross & Mitchell,* for appellee.

EVANS, J.—I.   The negligence charged is predicated upon erroneous diagnosis, upon the use of improper virus, and upon improper methods of performing the vaccination.

On October 25, 1922, the plaintiff observed symptoms of illness in a few of his hogs.   On the same day he called the defendant to see them.   The plaintiff at the time had a drove of 193 hogs.   139 thereof had been very recently purchased from McCarty.   The sick hogs were a part of such purchase.   The defendant advised the vaccination of the entire drove, on the theory that the sick hogs were probably, or at least might be, afflicted with cholera.   Arrangements were then made for the vaccination on the following day.   From that date to the first day of December, 93 of the hogs died.   In the presentation of his case, the plaintiff takes the ground that none of them died of cholera, but that they all died of so-called "blood poisoning," and that their condition was caused by improper vaccination.

The theory of vaccination as a remedy is not that it is curative, but that it is preventive.   A certain cholera-producing virus is introduced into the blood circulation hypodermically; at the same time an antidote called a "serum" is introduced in like manner into the circulation.   The antidote is supposed to overcome the cholera virus, and thereby to render the animal immune from further cholera infection.   We shall presently set forth sufficient quotations from the testimony of the plaintiff's experts to show the present state of knowledge and discovery on the subject of cholera and the other hog diseases which are often, if not usually, closely associated therewith.   From these it appears that the cholera germ has never been discovered or isolated; that there are several other diseases which are closely associated and often complicated with cholera, and of which the germs have been discovered and isolated; that some of these are specifically known as swine plague, hemorrhagic septicemia, malignant edema, etc.   Though the presence of cholera is attended with certain recognized symptoms, all these symptoms also attend, in a greater or less degree, the other named swine diseases.

The experts, therefore, are never able to distinguish with certainty the symptoms of cholera from the symptoms of septicemia. Whether the death of a hog is the result of cholera can only be determined by a post-mortem examination, and even then not always with certainty. The plaintiff has built up his case on the theory that his hogs were not infected with cholera, but were infected with "blood poisoning," and that the defendant must have infected them. "Blood poisoning" is only a popular name for "septicemia" and "malignant edema." For that matter, it could as well be applied to the infection of cholera itself. The dominating idea apparent in plaintiff's theory is that, though the defendant might not be liable if he communicated cholera to plaintiff's hogs, yet he would be liable if he infected them with "blood poisoning."

The plaintiff has put much deadwood into the structure of his case, and it confronts us all through the record as a constant obstruction to an analysis of the case upon its real merits. For instance, the plaintiff attached to his petition 27 interrogatories, to be answered by the defendant, few of which were calculated to serve any useful purpose. Two of such questions are as follows:

"Int. 15. State whether you vaccinated any of said hogs while they were *standing up* in a crate, and if so, how many did you vaccinate when they were standing up in a crate? Answer........

"Int. 16. Did you vaccinate any of said hogs when they were *sitting down*, and if so, state how many? Answer......."

Nine grounds of negligence were charged in the petition, of which the following are some:

"(4) That the defendant did not place the said hogs in proper positions and under proper restraint for the insertion of the needles and introductions of serum, virus, and mixed infection at the time of vaccinating of said hogs, for that he inserted said needles in said hogs while some of them were standing up, or being held up, some were lying down, and others in different positions, and some were in a crate, and were vaccinated through the sides of the crate; and the needles of the syringes containing the serum, virus, and biologic were not introduced into the proper locations in the body of the hogs, in that he did insert,

in many of the hogs, the needle at the base of the tail and on the outside of the hind quarter, on the inside of the hind quarter, and on the back and above the hip; whereas said needle should have been inserted in the space between the forelegs of the hogs, and in the heavier hogs, directly behind the ear.

" (8)   That the defendant, in restraining said hogs for the purpose of vaccinating the same, caught hold of them with his own hands on different parts of the body of the hogs, whereas. he should have had someone catch the hog and hold it while he vaccinated the same.

" (9)   That, after the defendant had vaccinated or attempted to vaccinate said hogs for cholera, as above stated, the said hogs became infected with blood poison from the attempted vaccination made of them by the defendant, and had immediate swellings and discoloration on various locations of their bodies, which defendant saw, and he failed and neglected and *refused to treat said hogs for this condition or to do anything whatever for them, and permitted them to die from said poison.*"

Such irrelevancies as the foregoing are responsible for much of the volume of the record and for most of its confusion.

In order to clear the ground for a consideration of the essential merits of plaintiff's appeal, we shall deal first with those assignments of error which seem furthest removed therefrom.

(a)   The first assignment of error complains of the refusal of the court to allow plaintiff to prove that he paid McCarty $5,000 for 147 hogs.   The argument is that the price paid is evidence of the value.   If the argument be conceded, it has little application to the record.   It appears that the plaintiff bought from McCarty 147 hogs.   Only 139 are involved in this controversy, eight of them not having been yet delivered at the time of defendant's employment by plaintiff.   These hogs varied in value from $25 each to $200.   McCarty had so testified to the values of the 139 that had been treated by the defendant.   Such evidence given by McCarty was received without objection. Proof that $5,000 was paid for 147 hogs was not evidence of the value of the 139 hogs involved.   There was no error.

1. EVIDENCE: relevancy, materiality, and competency: value: purchase price.

(b)   Appellant predicates complaint upon the following record:

"Tell the jury whether you believed those statements made to you at that time? A. Yes, sir, I believed them."

Objection was sustained to this question. This was a part of the examination of plaintiff as a witness. It had reference, to the conversation between the plaintiff and defendant, when the defendant advised the plaintiff to have all his hogs vaccinated. This is not an action for false representation. The plaintiff testified to no representation by the defendant, as distinguished from his diagnosis and his advice that vaccination be made.

2. TRIAL: reception of evidence: reliance on representations.

(c) Complaint is predicated upon the following record: "How much of a bill did he present for his services?" Objection was sustained to this question. The question was propounded to the plaintiff. He had pleaded the amount which he had paid the defendant, and the defendant had admitted it in his answer.

(d) Complaint is predicated upon the following record, pertaining to the testimony of McCarty as his witness:

"Is this Doctor D. H. Miller living now? Yes, he is living. Where is he? (Objected to as immaterial. Sustained.)"

McCarty testified that, in the fall of 1918, and again in the fall of 1919, he had employed Dr. D. H. Miller to vaccinate all his hogs. This was three years prior to the events under consideration. Nor does it appear that any of the hogs involved in this controversy were in existence at that time. It does appear affirmatively that many of them were not. The ruling was proper. What is here said applies equally to plaintiff's offer to "give a description of what Dr. D. H. Miller did at that time in vaccinating the said hogs." It is likewise applicable to the offer to prove the vaccination in the fall of 1920 of the certain eight hogs which were last delivered by McCarty to the plaintiff, and which were in no manner treated by the defendant or affected by his conduct.

II. Other assignments of error predicated upon rulings on the admission of evidence go to the gist of the case, and are so connected with each other and so related to the grounds upon which the verdict was directed that they may all be considered together more advantageously than to attempt separate consideration of each one.

The plaintiff introduced evidence in purported support of his charges of negligence. There was no evidence of improper virus. The alleged improper diagnosis may be ignored, for rea-

3. EVIDENCE: opin-
ion evidence:
competency of
expert.

sons hereinafter appearing. If there was an erroneous diagnosis, it was, at most, an error of judgment at a point where there was no sure guide. It was also immaterial because the purpose of the vaccination and the effect thereof, if any, were to prevent cholera,— not to cure it. As to the method used by the defendant, there is no evidence that his needles were not properly sterilized. The plaintiff introduced evidence that the usual method of vaccination is to insert the needles on the inside of the ham and on the inside of the shoulder blade; that the defendant did not confine his insertion to such places, but inserted the needle in various parts of the body. The purpose of the insertion is to introduce the contents of the syringe into the blood stream. There is no evidence that this may not be done safely by the insertion of the needle into various portions of the body other than ham and shoulder blade; nor is there any evidence that the insertion of the needle in other portions of the body is attended with any greater danger. 193 hogs were vaccinated the same day. The plaintiff had provided no conveniences for the work. The hogs were running in a large pen, and each hog was cornered and caught and vaccinated. Though the petition charges the defendant with having vaccinated some of the hogs "standing up," and others "sitting down," and some "at the base of the tail and on the outside of the hind quarter, on the inside of the hind quarter, and on the back and above the hip," yet the plaintiff himself, as a witness, described the method as follows:.

"Dr. Leuth vaccinated all the barrows and gilts—about 85—in a trough,—just an ordinary hog trough, maybe about 10 feet long, with 6-inch boards on the sides, and the bottom of the trough was made out of 10- or 12-inch boards. Dr. Leuth laid them in that trough on their backs, and some had their legs spread open, and some wasn't."

There was evidence that, under proper practice, the place of the insertion of the needle should be cleansed before the insertion, and evidence also that this course was not followed by the defendant. If there is any evidence of negligence in the

record, it is at this point. Whether this was sufficient to go to the jury on the question of negligence, we shall have no occasion to consider, in view of what hereinafter appears. It is to be borne in mind, however, that the vaccination of a drove of hogs is not an immaculate job.

The crux of plaintiff's case came with his attempt to show that the vaccination was the cause of the death of the hogs. The plaintiff attempted to do this by a very sweeping and general opinion by an expert witness, Dr. Moore, a competing veterinary surgeon at Council Bluffs. Dr. Moore was examined at length by the plaintiff. The call for his opinion was finally put to him by various forms of questions, to each of which objection was sustained by the trial court. The purport of these questions is indicated by the final offer made by the plaintiff as to what he expected to prove by the witness, as follows:

"The plaintiff offers to show that those abscesses on the hogs described by the witness in his testimony were caused by blood poisoning, and that this blood poisoning was caused *by the administration and the vaccination of the hogs by Doctor Leuth* on or about the 25th of October, 1922, and that such poisoning was caused by the *improper condition and unclean condition of the needle used by Doctor Leuth* in sticking the hogs at the time of vaccination."

The question presented was whether the purported facts set forth in this offer could properly be proved by the expert opinion of Moore. The ruling on this offer of plaintiff's involves a consideration both of the question whether a proper foundation was laid for such an expert opinion and the further question whether the nature of the facts presented was such that they could be proved by the opinion of one who had no personal knowledge of the alleged acts of negligence of the defendant. The consideration of these questions involves a survey of a considerable part of the record, and especially of the testimony given by Dr. Moore, preceding this interrogation.

The vaccination occurred October 26, 1922. Dr. Moore began his observation and treatment of the hogs on November 6th following. The 93 hogs which are alleged to have been lost, died during the month of November, dying at the rate of two or three a day, beginning October 31st. Moore's treatment of

the remaining hogs extended into the months of December and January. He made ten visits during the month of November, and during that month treated 40 of the hogs, and no more. His treatment consisted in draining abscesses. He gave no medicine at any time. He testified, in substance, that he could not diagnose cholera by observation; that there were no sure symptoms of hog cholera that were not likewise symptoms of other swine plagues; that hogs in that territory were subject to half a dozen different forms of swine diseases, all of which were caused by a poisonous germ, finding its way into the blood stream. He testified on cross-examination as follows:

"Hog cholera results from a filterable bug or virus. You can put a solution containing hog cholera in a porcelain jar, and it will go right through it. It is so fine and so small that it has never yet been isolated. The greatest magnifying glass or most critical chemical test have never isolated the bug. Loss of appetite is one of the symptoms of hog cholera. When I got out there to examine these hogs, I found their appetites were impaired. The gummy secretion from the eyes is also a symptom of cholera. I told the jury that I observed that condition of the eyes of the hogs. There were two symptoms of cholera that I found in the herd. You cannot taste the principle or agency of hog cholera; you cannot smell it. It is so small that it cannot be seen with the most powerful magnifying glass. You don't vaccinate hogs to cure hog cholera. It is a preventative. The double treatment—that is, where you use the virus and serum—is given to prevent hog cholera. If a hog has cholera, you don't use virus. I cannot tell by looking at a hog whether he has cholera. I cannot tell by looking at a hog whether he has swine plague. When I went out to examine these hogs, I didn't notice particularly whether some of them had arched backs and were walking around with drooped heads and were groggy. The hogs showed evidence of sickness. Some were lying around. Some had arched backs; some did not. Swine plague is known as hemorrhagic septicemia. The principle or virus or bug that produces swine plague is known as suipestifer. We have isolated that bug. It is very frequent that, when a hog has cholera, that it is frequently complicated with swine plague. Anything that reduces the vitality of a hog makes it

more susceptible to swine plague. I never made any analysis of the pus that came out of the abscesses that I have spoken about. I would do that with a microscope. No pus can be formed without some bug that causes it. I made no examination out there, to see what pus-producing germs or organisms were causing these abscesses. Q. Now then, if anything was put into the hog except the principle of cholera, so far as your profession is concerned, you ought to be able to isolate it, oughtn't you? Any of those diseases, now, except cholera,—you ought to isolate the bug. That you have not done, and it can't be done, so far as you know now, is that true? A. That question again. Q. Well, I will repeat it. Any of the bugs that affect the health of a hog, like swine plague,—any of those bugs, except the principle or agency of hog cholera, have been isolated, haven't they? A. Yes, sir. Q. Now, then, you at no time took this pus that was formed by some organism, or caused by some organism, and made an examination of it? A. No, sir. Q. And you don't know what principle or agency entered into the formation of the pus, or caused the pus in those abscesses that you spoke about,—you don't know, do you? A. No, sir. These needles and syringes are made by standard houses. I use the Champion. Another standard make is the Viking. They are made by reputable houses. These needles that are used are hollow. In using these needles, they might carry a little of the solid tissue from the hide of the hog in with it. That would be true of any needle that our profession recognizes as proper. The skin of a hog is hard to sterilize. All that you can do when you are vaccinating is to put some substance there on the hog,—that is, a disinfectant,—and then stick your needle in. You don't cut the hair off and shave it. You clean the surface of the hog. We sterilize needles with Lacrisolis compound. That is recognized by our profession as a satisfactory disinfectant or sterilizer. A proper method of sterilizing the syringe is to sterilize it before leaving the office, and wrap it in sterile gauze. You then do the work at hand. If you had 150 or 300 head of hogs, after you had sterilized your syringe in your office and wrapped it up in sterile gauze, you would take it with you where you are doing the work, and you would complete the job before you resterilize. That method is recognized as a proper method in our profession,

and was recognized in October, 1922. Malignant edema is a disease characterized by diffused swelling. It is an infection, and the result of a bug. It comes from the bacillus of malignant edema. It is an infective disease. The bacillus travels or is carried by crows, by dogs, on men's feet, on wagon wheels, and by the air. The ways for carrying the germ are numerous. It can be taken in through breathing, or through the alimentary canal. It is usually taken into the system through a break in the skin, or through a scratch, or things of that kind. It is true that one way that the principle of malignant edema gets into the system is through a puncture of the skin. Q. So that the only way that the principle of malignant edema gets into the system is from the outside? When this wound is made upon the hog after an injection of serum or virus, it is not impossible for this principle to enter at that place? * * * A. It could. A hog might be infected with hog cholera and might have carried the agency or principle of hog cholera for three or four or five days, and not show the slightest symptoms of it. It might have been that, two or three days before these hogs were vaccinated, that they might have taken into their systems the principle of cholera and it would not have been apparent until five or six or seven days after that. You would not know whether the hog had cholera until the disease had progressed far enough until it began to show visible symptoms of hog cholera. A hog might be infected with cholera for from five to seven days before it is visible by observation. The usual period of incubation is in the neighborhood of seven days. I might be called upon to vaccinate a hog and he might have been infected with hog cholera for five or six days, and I not know it. I was present when Doctor Gidley posted one of the hogs on November 10th. He cut the hog open and took out the kidneys and intestines. On that particular hog I did not see any petechial spots. If a hog had cholera, you would find petechiæ on the kidneys, on the liver, lungs, intestines, and bladder. *It is not always present.* I only saw Doctor Gidley post one hog, and I did not see any evidences of hog cholera. Q. Now then, as I understand you from your testimony that these abscesses were formed because of some pus-producing germ, and that any one of five or six of those germs could have produced them? A. Yes, sir. *I am not*

*able to say which one of the pus-producing germs was respons-
ible for the pus when I was there.* In the serum given for hog
cholera, the thing that tends to prevent hog cholera is called
antibody. I never saw an antibody; I never tasted one; I never
smelled one. It is just another expression for a conception. They
simply name it that because they don't know anything else to
call it. Hog-cholera serum is taken from the blood of a hog.
You could put something in to sterilize it, but if you get it very
strong, you would destroy the antibodies. You cannot sterilize
blood products. If you had one hundred cc. of serum and took
out five cc. of serum, there isn't any way in the world to know
if you took out all of the antibodies; the only way to tell it would
be to try it on a hog. After all, it depends upon experiment;
it is the result of an experiment. There are nine or ten ills or
sicknesses of hogs in this locality. Whether you prevent hogs
from dying by vaccinating *depends upon all the other diseases,—
whether the hog has got any of the other diseases that he is heir
to; and nobody can tell that when he vaccinates.* I have seen
abscesses develop from. vaccination on a hog. I was not down
there on the 26th day of October when the hogs were vaccinated,
and did not see them at that time. When a hog is vaccinated,
virus is injected into the hog, to give it hog cholera. You in-
ject with the serum then, to counteract the principle of hog
cholera. After the reaction, there is a time when the hog is
affected with cholera.''

This witness was permitted to testify that the hogs did
not die of cholera, and that they did die from ''septic poison-
ing.'' The fact that the hogs did not die of cholera would be
consistent with successful vaccination. The plaintiff gained
nothing, therefore, by that negative. This witness testified also
that *proper* vaccination would not cause the condition in which
he found the plaintiff's hogs.

Upon the foregoing record of the preceding testimony of
this witness, was it competent for him to state his opinion that
the sickness of these hogs was caused by the *improper vaccina-
tion* of the hogs *by the defendant,* and by the ''unclean condi-
tion of the needle used by Dr. Leuth?'' The witness had no per-
sonal knowledge of the method of vaccination adopted by the
defendant; nor was the question put to him hypothetically; nor

is there any evidence in the record of any improper condition of defendant's needles. Having testified that *proper* vaccination would not have caused this sickness, he was asked to testify that the vaccination *by defendant did* cause it, and that, therefore, such vaccination must have been improper. This is the analysis of an affirmative answer to the plaintiff's questions. Though there were nine or ten swine diseases prevalent in that territory, and though five or six of them, excluding cholera, were infectious germ diseases, caused by the presence of malignant germs in the blood stream, and though some of these would enter the blood stream through any external wound, and though the germ of each of these diseases had been isolated and was discoverable by a microscopic examination, and though plaintiff had not discovered which of these diseases had afflicted these hogs, he is yet asked to state an expert opinion that, whatever the disease was, it was caused by the defendant's method of vaccination. This would not be expert opinion. It would be a mere conclusion, reached by a course of reasoning, and the reasoning would be predicated upon facts concerning which the witness had no personal knowledge.

The witness gave to the plaintiff the benefit of all his expert knowledge on the subject of swine diseases, as set forth above. Acting upon such expert knowledge, and giving full effect thereto, together with the other evidence herein indicated, could a jury be permitted to find that the defendant was responsible for the condition of plaintiff's hogs? Concededly, the sickness had begun in the drove before the defendant was called. The sickness proved malignant. Excluding cholera, there were five or six natural causes, from any one of which such sickness could result. Each of them was virulent and stealthy; undiscoverable to the naked eye, though discoverable by microscopic examination. Any one of them would produce the symptoms present in these hogs. Their ways of entering the blood stream were quite innumerable. The situation presented was that this sickness could have resulted from any one of a half dozen causes. It being assumed that the defendant's vaccination was one of such possible causes, the burden was upon the plaintiff to show that it was *in fact* the cause. The presence of natural causes

prevalent in that territory was a presumptive explanation of the cause of the sickness. The burden was upon the plaintiff to introduce some evidence .tending to single out the defendant's alleged negligence as the cause, and to that extent to negative the other causes. It was in obedience to this rule that plaintiff sought to cover the gap by expert opinion.

If, upon the expert information given by the witness, a jury could not be permitted to find the defendant liable as the proximate cause of plaintiff's injury, we see no better reason for saying that the witness could do so. This record furnishes no fair ground for saying that the loss of plaintiff's hogs did not result from one of the ordinary malignant swine diseases naturally prevalent in that territory. Surely, the defendant was not responsible for the first sickness that appeared in the drove. Plaintiff has made no attempt to explain the first sickness, other than to say that it was not cholera. We have accepted, up to this point, the plaintiff's assumption that these hogs were not threatened with cholera. Plaintiff has no evidence in support of that assumption, except the fact that, after the vaccination had worked, cholera was not discoverable. Such result was precisely the function of the vaccination. The expert testimony for the plaintiff discloses rightly that cholera is usually accompanied and complicated by these other swine plagues. There is no way to discover in advance whether such complication is present or not. If present, vaccination will not be effective against it. There is no evidence in this record from which it can be said that such complication was not present in this case. No fact is made to appear which is inconsistent with just such a situation; and this is so even though it be assumed that the defendant was negligent in his method of vaccination. Such negligence would not necessarily result in the virulent sickness of these hogs, and the burden was upon the plaintiff to show that it did so result. We are clear that it was not competent for this expert witness, on the foundation thus laid, to testify to an opinion that the defendant's method of vaccination was the cause of the loss of these hogs. What is here said, is also applicable to the testimony of the other expert witnesses. We are not criticizing the expert testimony. Within its appropriate field, it was proper and enlightening. But it was not such as to

qualify the witness to answer the questions propounded.

We hold that the objections to the questions were properly sustained on two principal grounds:

(1)   That the preceding examination of the witness disclosed that he had failed to inform himself as to what disease afflicted the hogs.  In order to testify to an intelligent opinion as to what caused the disease, it was essential that he should know, as an expert, what the disease was.  He failed, therefore, to qualify.

(2)   An affirmative answer to the various questions put to him would require him to say that whatever was done by the defendant must have been improper and negligent.  Such opinion by him would be predicated, not upon personal knowledge, and not upon hypothetical statement, but solely upon a process of reasoning based upon hearsay evidence of nonexpert facts. This would be a pure conclusion on the part of the witness, and none the less so because he was an expert.

The plaintiff's case presented a wide gap between alleged cause and effect.  It was incumbent upon the plaintiff to build a causeway over such gap by a showing of facts and circumstances over which the jury could properly pass, in order to find that the method of vaccination was the cause of the disease.  It was not permissible to the plaintiff to avoid this burden by covering the gap with a leap of expert opinion.  The proposed evidence was a proposed leap, and nothing else or more.

There is an indirect circumstance apparent in the record, from the significance of which we cannot wholly escape.  It tends to illustrate the essential soundness of the conclusion we reach.  We have already referred to the fact that no microscopic analysis was made of the pus taken by Moore from these diseased hogs, though he testified that such an analysis would have revealed the nature of the particular disease from which they were suffering.  It would disclose the particular germ or germs. Different hogs might have been afflicted with different diseases, all presenting common symptoms externally.  It further appears that, about November 7th to 9th, the plaintiff, desiring to find out just what was the ailment afflicting his hogs, applied to the public authorities of the state for the assistance of an expert.  Thereupon, Dr. Gidley was sent, to make an examina-

tion of the situation. He made several post-mortem examinations. Such an examination furnishes the most favorable opportunity for correct diagnosis. He is the only person who made such an examination. He alone had the best expert knowledge as to the ailment of plaintiff's hogs. He was present at the trial under subpoena from the plaintiff, but *was not examined*.

Inasmuch as the plaintiff failed to establish a causal relation between defendant's alleged negligence and the plaintiff's loss, either by introducing or by offering proper evidence to that end, he is not entitled to recover.

The order of the district court is affirmed.—*Affirmed*.

FAVILLE, C. J., and ARTHUR and ALBERT, JJ., concur.